IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD AND JODI GUTTERMAN, Individually and as Parents and Next Friends of MADISON GUTTERMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | 15 C 5714 |
| v. | ) ) | Judge John Z. Lee |
| TARGET CORPORATION and BRAVO SPORTS, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises from injuries that Madison Gutterman ("Madison") suffered while riding a skateboard within a Target store in Vernon Hills, Illinois. Her parents, Donald and Jodi Gutterman ("Plaintiffs"), brought suit on her behalf against Target and Bravo Sports ("Bravo"), which manufactured and distributed the skateboard at issue. Target and Bravo have separately moved for summary judgment. For the reasons that follow, both motions [61] [73] are granted.

## Background[1]

On May 26, 2013, Donald, Jodi, and Madison visited Target's store in Vernon Hills. Target's LR 56.1(a)(3) Stmt. ¶ 10, ECF No. 62. Madison, age eleven, was one month away from her twelfth birthday. *Id.* ¶ 14. While they were shopping,

---

[1] The following facts are undisputed except where noted. The parties' statements of facts and responses regarding the two separate motions are largely duplicative. Thus, for ease of understanding, the Court primarily cites the statements and responses dealing with Target's motion.

Madison asked Donald and Jodi if she could go off by herself to a different section of the store, and Donald and Jodi agreed. *Id.* ¶¶ 15–16.

Madison went to a section of the store where skateboards were on display. *Id.* ¶ 24. She took a skateboard off the shelf, placed it on the floor, and rode it down an aisle. *Id.* ¶ 27. The aisle was clean, clear, and dry, and there were no obstructions on the floor. *Id.* ¶ 29. Despite this, the parties agree that the floor was hard, slick, and unfit for skateboarding. *See* Pls.' LR 56.1(b)(3)(C) Stmt. (Target) ¶ 76, ECF No. 89. After riding the skateboard for a short period of time, Madison fell off and sustained injuries that spurred the action before this Court. Target's LR 56.1(a)(3) Stmt. ¶¶ 21–22.

The skateboard at issue was manufactured and distributed to Target by Bravo. Pls.' LR 56.1(b)(3)(C) Stmt. (Target) ¶ 72. Bravo placed "deterrent devices" on all skateboards it distributed to Target, including those that arrived at the Vernon Hills store prior to May 26, 2013. *Id.* ¶¶ 73, 75. "Truck boxes" are the only deterrent device Bravo used with the type of skateboard at issue. *Id.* ¶ 75. A truck box is "a cardboard box that covers the rear axle and wheels of the skateboard." Target's LR 56.1(a)(3) Stmt. ¶ 39. The box is affixed to the skateboard with hot glue or packaging tape. *Id.* ¶ 41. It can be removed quickly and easily by simply pulling it off. *Id.* ¶ 42. The purpose of the box is twofold: to protect the skateboard from damage pre-sale, and to protect customers by deterring them from riding skateboards in stores. *See id.* ¶ 40. Here, however, the parties agree that no truck box was affixed to the skateboard at issue when Madison rode it and that the truck

box thus must have been removed at some point prior. *Id.* ¶ 55; Pls.' LR 56.1(b)(3)(C) Stmt. (Bravo) ¶ 57, ECF No. 91.[2]

Additionally, at the time Madison rode the skateboard, its surface was covered in plainly visible plastic shrink wrap meant to protect the board's surface during manufacturing and distribution. Target's LR 56.1(a)(3) Stmt. ¶¶ 43, 45; *id.*, Ex. G, ECF No. 62-8. The plastic wrap covers "grip tape" that provides traction on the board's surface; thus, the board is unsuitable for riding before the wrap is removed. *Id.* ¶ 45. The parties agree that the fact that the board's surface remained wrapped contributed to Madison's fall. Pls.' LR 56.1(b)(3)(C) Stmt. (Target) ¶ 76. Bravo placed a warning sticker on top of the plastic wrap that reads as follows: "WARNING! Reduce the risk of serious injury and only use this skateboard while wearing full protective gear—Helmet, Knee Pads, Elbow Pads, Wrist Guards, and Flat Soled Shoes[.] Max Rider Weight 110 lbs[.]" Target's LR

---

[2]     Plaintiffs at times take the position that the skateboard at issue was not shipped with a deterrent device. *E.g.*, Pls.' Resp. Opp'n Bravo's Mot. Summ. J. 6, ECF No. 90. But this position is belied by Plaintiffs' own statement of facts, which asserts that "Bravo placed deterrent devices on all of the skateboards it distributed to massmarket retailers such as Target," Pls.' LR 56.1(b)(3)(C) Stmt. (Bravo) ¶ 40, and that prior to the date of the incident, "skateboards arrived at the Vernon Hills store from the distribution center with deterrent devices attached." *Id.* ¶ 42. Moreover, Plaintiffs advance nothing more than speculation that the skateboard at issue was distributed without a truck box, which is insufficient to create a genuine issue of fact on summary judgment. *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). It is irrelevant whether the type of skateboard at issue did not have a design specification for a deterrent device, Pls.' LR 56.1(b)(3)(C) Stmt. (Bravo) ¶ 58, because it is undisputed that Bravo distributed the type of skateboard at issue with a truck box. Additionally, testimony from a store employee that she "did not recall ever seeing a skateboard for sale at Target with its wheels boxed in," *id.* ¶ 76, may indicate truck boxes were frequently removed, but such testimony is not evidence from which a reasonable juror could conclude Bravo failed to deliver the skateboard at issue with a truck box attached.

56.1(a)(3) Stmt. ¶¶ 46–47, 49.[3]  Madison wore flip flops, and no other protective gear, while riding the board.  *See id.* ¶¶ 13, 28.  The parties dispute whether wearing flip flops contributed to Madison's injury and what impact wearing protective gear would have had.  Target's Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 76, ECF No. 96.

Madison had experience riding skateboards; "she knew how to ride the skateboard she took off the shelf in the store that day, and there was nothing new, different, or unusual about this skateboard as compared to other skateboards she had previously ridden."  Target's LR 56.1(a)(3) Stmt. ¶ 30.  At a more basic level, she knew "that a skateboard has wheels, that it rolls on those wheels, that she could fall off of it, and that if she were to fall off of it, she could get hurt."  *Id.* ¶ 33.  Moreover, while the parties dispute the precise guidance Donald and Jodi had given her about using skateboards in a store, riding with flip flops, and riding without protective gear, there is no dispute that they generally advised her against these activities.  Target's LR 56.1(a)(3) Stmt. ¶¶ 17–18; *id.*, Ex. B, at 38:20–40:1, ECF No.

---

[3]  Plaintiffs (at least in regard to Target's motion) seem to dispute the fact that the warning sticker was attached to the skateboard when Madison took it off the shelf, pointing out that Madison's testimony does not establish that it was affixed.  Pls.' LR 56.1(b)(3)(B) Stmt. (Target) ¶ 49, ECF No. 89.  But they agree in the next paragraph that the skateboard was in the condition depicted in Target's photograph of the skateboard at issue, which clearly displays the sticker affixed to the board.  *Id.* ¶ 50; Target's LR 56.1(a)(3) Stmt., Ex. G.  (In response to Bravo's motion, they simply admit the warning sticker was attached. Pls.' LR 56.1(b)(3)(B) Stmt. (Bravo) ¶ 38, ECF No. 91.)  Thus, even though Madison did not testify that the sticker was affixed or that she read it, Plaintiffs do not raise a genuine dispute about whether the skateboard at issue had a warning sticker.  In any case, Madison's testimony states that she did not recall reading the sticker, not that it was not affixed to the skateboard.  Target's LR 56.1(a)(3) Stmt., Ex. D, at 19:13–16, ECF No. 62-5.

62-3; *id.*, Ex. C, at 20:17–21:7, 25:2–14, ECF No. 62-4; Bravo's LR 56.1(a)(3) Stmt. ¶¶ 13–15, ECF No. 75; Target's Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 110.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, courts "must construe all facts and reasonable inferences in favor of the nonmoving party." *Dorsey*, 507 F.3d at 627. But "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Id.* (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)) (internal quotation marks omitted).

## Analysis

### I.    Claims Against Target

Plaintiffs first seek to recover against Target on theories of common law negligence and violation of the Illinois Premises Liability Act. Target has moved for summary judgment on the grounds that the skateboard by which Madison suffered

her injuries was an open and obvious danger, and that Target owed Madison no duty of care.

In this diversity action, the Court applies Illinois law. *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir. 1999). To succeed in a claim of negligence, "the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach." *Bruns v. City of Centralia*, 21 N.E.3d 684, 688–89 (Ill. 2014). The existence of a duty is a question of law. *Id.* at 689.

In determining the existence of a duty, Illinois courts ask "'whether defendant and plaintiff stood in such a relationship to one another that the law imposed upon defendant an obligation of reasonable conduct for the benefit of plaintiff.'" *Bruns*, 21 N.E.3d at 689 (quoting *Ward v. K Mart Corp.*, 554 N.E.2d 223, 227 (Ill. 1990)). Four factors are relevant to this analysis: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Id.*

The "open and obvious rule" is a common law construct that mitigates a party's duty to protect another from a potentially dangerous, yet open and obvious, condition. *Id.* The open and obvious rule applies in both negligence and premises liability actions. *Id.* at 689–90; *Ward*, 554 N.E.2d at 229–30. "'Obvious' means that 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception,

intelligence, and judgment.'" *Bruns*, 21 N.E.3d at 690 (quoting Restatement (Second) of Torts § 343A cmt. b (1965)). "Whether a dangerous condition is open and obvious may present a question of fact," but if there is no dispute as to the "physical nature" of a condition, as is the case here, whether it is open or obvious is a question of law. *Id.*[4]

Importantly, a finding that a condition is open and obvious does not of itself preclude the existence of a duty. *Bruns*, 21 N.E.3d at 690. Rather, in carrying out a traditional duty analysis, courts use the open and obvious rule in evaluating the first two factors of the duty inquiry: the foreseeability and likelihood of injury. *Id.* In regard to foreseeability, the open and obvious nature of a condition reduces the reasonable foreseeability of injury, because it is reasonable for a defendant to expect that a plaintiff will avoid an open and obvious danger. *Id.* at 694. Similarly, the likelihood that a plaintiff will avoid an open and obvious danger reduces the likelihood of injury under the second factor. *Id.* at 695. After incorporating the open and obvious rule in this manner, courts proceed as usual to consider the magnitude and consequences of placing a burden on the defendant. *Id.*

The open and obvious rule applies just the same when children are involved. *Corcoran v. Vill. of Libertyville*, 383 N.E.2d 177, 180 (Ill. 1978) (stating that "[e]ven

---

[4]     Plaintiffs' citation to *Qureshi v. Ahmed*, 916 N.E.2d 1153 (Ill. App. Ct. 2009), for the proposition that the issue of whether a dangerous condition is open and obvious is typically a question of fact, Pls.' Resp. Opp'n Target's Mot. Summ. J. 8, ECF No. 88 (citing *Qureshi*, 916 N.E.2d at 1158), misstates the law. The case is an Illinois appellate court decision that precedes *Bruns*. In any event, *Qureshi* involved disputed facts as to the nature of the product at issue (there, a treadmill) and the danger it presented, 916 N.E.2d at 1159, whereas here, the parties do not dispute the skateboard's physical qualities or the danger it presented.

if an owner or occupier knows that children frequent his premises, he is not required to protect against the ever-present possibility that children will injure themselves on obvious or common conditions"). As the Supreme Court of Illinois has explained, "'[i]t is always unfortunate when a child gets injured while playing, but a person who is merely in possession and control of the property cannot be required to indemnify against every possibility of injury thereon. The responsibility for a child's safety lies primarily with its parents, whose duty it is to see that his behavior does not involve danger to himself.'" *Id.* (quoting *Driscoll v. Rasmussen Corp.*, 219 N.E.2d 483, 486 (Ill. 1966)). To that end, "'[t]here are many dangers, such as those of fire and water, or of falling from a height, which under ordinary conditions may reasonably be expected to be understood and appreciated by any child of an age to be allowed at large.'" *Id.* (quoting Restatement (Second) of Torts § 339 cmt. j (1965)). And "a possessor of land is free to rely upon the assumption that any child old enough to be allowed at large by his parents will appreciate certain obvious dangers or at least make his own intelligent and responsible choice concerning them." *Mount Zion State Bank & Trust v. Consol. Commc'ns, Inc.*, 660 N.E.2d 863, 868 (1995).

Illinois courts have had various opportunities to determine whether particular conditions are analogous to fire, water, and heights such that they are openly and obviously dangerous. While no Illinois court (or, by the Court's research, any court) has reached the issue of whether riding a skateboard in circumstances similar to this case constitutes an openly and obviously dangerous condition, two

applications of the open and obvious rule provide some guidance. The first involves recreational trampolines, which Illinois courts have invariably determined are an openly and obviously dangerous condition when children jump on them. *Qureshi*, 916 N.E.2d at 1158 (collecting cases). The cases highlight the risk of falling from a height that trampolines present. *Id.* Similarly, Illinois courts also recognize that "even a child is expected to comprehend the danger of falling from a slide." *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 474 (7th Cir. 1991) (citing *Alop by Alop v. Edgewood Valley Cmty. Ass'n*, 507 N.E.2d 19, 21–23 (Ill App. Ct. 1987)); *see Young by Young v. Chi. Hous. Auth.*, 515 N.E.2d 779, 782 (Ill. App. Ct. 1987) ("A 5-year-old child knows that if he or she falls from a height onto concrete while, *e.g.,* playing on monkey bars, he or she probably will get hurt."); *see also Wreglesworth ex rel. Wreglesworth v. Arctco, Inc.*, 740 N.E.2d 444, 451 (Ill. App. Ct. 2000) (concluding that colliding with a pier presented an open and obvious danger to a minor riding a jet ski).

Here, riding a skateboard in a Target store presents an open and obvious danger little different from the facts in the above cases. A reasonable near-twelve-year-old in Madison's position would recognize, just as Madison admittedly did, that a skateboard is a precarious device that rolls on wheels and invites the user to fall. Target's Rule 56.1(a)(3) Stmt. ¶¶ 30, 33; *see Williams v. Toys "R" Us*, 138 F. App'x 798, 801 (6th Cir. 2005) (internal citation omitted) ("'A skateboard is an object of considerable size. These devices are ubiquitous, and their propensity to roll easily under the weight of a human body is patent.' . . . [A]n ordinary person would be

aware that stepping onto [a] skateboard could cause that person to slip and fall."). The height of such a fall may be less than that from a trampoline, but the speed of a skateboard's movement presents its own, additional hazard. Thus, there is no reason why jumping on a trampoline or using playground equipment can constitute an openly and obviously dangerous condition, while using a skateboard would not.

The particular circumstances of this case only buttress this conclusion. Madison rode the skateboard while wearing flip flops, Pls.' LR 56.1(b)(3)(C) Stmt. (Target) ¶ 44, which a reasonable near-twelve-year-old would know provide inferior support while playing or engaging in athletic activity. Madison's parents told her as much. Target's LR 56.1(a)(3) Stmt. ¶ 17; *id.*, Ex. B, at 38:20–40:1; *id.*, Ex. C, at 20:17–21:7, 25:2–14; Target's Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 110. Additionally, the skateboard was still wrapped in clearly visible plastic packaging that covered the skateboard's grip tape and made the skateboard's surface slippery. Target's LR 56.1(a)(3) Stmt. ¶ 44; *id.*, Ex. G. A reasonable near-twelve-year-old familiar with skateboards, as Madison was, *id.* ¶¶ 30, 33, would know that riding a skateboard with plastic wrap covering its surface would only increase the risks already present. Reasonably prudent judgment would influence not only refraining from using the skateboard in the store, but at the very least, removing the plastic wrap. Furthermore, a reasonable near-twelve-year old with experience riding skateboards would know that a hard, slick retail store floor, Pls.' LR 56.1(b)(3)(C) Stmt. (Target) ¶ 76, is a particularly precarious surface on which to ride a skateboard. Finally, a warning sticker was attached to the skateboard that noted the serious risk of injury

and advised proper equipment to use when skateboarding.[5]  Target's LR 56.1(a)(3) Stmt. ¶¶ 46–47, 49.  A reasonable near-twelve-year-old would be able to read and understand the warning and appreciate the consequences of ignoring it.

For the foregoing reasons, the Court concludes that the dangers presented by riding the skateboard in the circumstances that existed here would be open and obvious to a reasonable near-twelve-year-old in Madison's position at the time of the accident.[6]  As such, Madison's injury was not reasonably foreseeable to Target, because it could reasonably have expected Madison to avoid the open and obvious danger presented by the skateboard.  Similarly, because the open and obvious nature of the danger presented by the skateboard made it likely Madison would avoid any injury, Madison's injury was not likely to occur.

This leaves only the magnitude of the burden that placing a duty on Target in this case would create and the consequences of imposing such a burden.  The

---

[5]     Plaintiffs argue that there is question of fact about whether flip flops constitute flat-soled shoes—which the skateboard's warning stated should be used when riding—and whether a reasonable near-twelve-year-old would believe as much.  Pls.' Resp. (Target) at 10.  This argument misses the mark in two respects.  First, it misunderstands the nature of the open and obvious inquiry, which is generally for the court to conduct unless there is a dispute about the physical quality of the condition at issue.  Second, even if flip flops are not flat-soled shoes, the warning sticker cautioned that riding a skateboard can cause serious injury and went on to list several more items of protective gear that should be worn, all of which point to the open and obvious danger of the condition in this case.

[6]     This analysis demonstrates how *Cruzen ex rel. Cruzen v. Sports Authority*, 369 F. Supp. 2d 1003 (S.D. Ill. 2005), is inapposite.  There, the court declined to conclude as a matter of law that an unsecured pogo stick left out in the front of a sporting goods store was an openly and obviously dangerous condition from the perspective of a fifteen-year-old that injured himself using the stick.  *Id.* at 1007.  Unlike here, the pogo stick had been removed from a box that displayed various warnings, including a weight limit exceeded by the plaintiff.  *Id.* at 1004, 1007.  This characteristic was not obvious from the stick itself.  *Id.* at 1007.  Additionally, the defendants misunderstood the scope of the open and obvious rule, precluding the court from concluding that a duty was not owed.  *See id.* at 1006.

magnitude of a burden reflects financial considerations relative to the specific condition at issue, whereas the consequences of a burden reflect broader, systemic concerns. *See Bruns*, 21 N.E.3d at 695; *Bucheleres v. Chi. Park Dist.*, 665 N.E.2d 826, 836–37 (Ill. 1996). Here, requiring Target to prevent accidents like this from happening would likely entail significant cost. Target would need to assign personnel to ensure at frequent intervals that deterrent devices remained attached to skateboards and regularly monitor the areas in which skateboards were kept to prevent them from being ridden in its stores. These costs are unjustified given the open and obvious danger that riding a skateboard in these circumstances presents. The consequences of such a burden could be even broader, as Target's inability to adequately police skateboard displays could require it to completely alter the manner in which it sells skateboards. Additionally, imposing a burden in this case might serve as a basis for imposing similar burdens regarding any manner of items in a Target store that could cause harm if used improperly by customers while browsing. *Cf. Blackford v. Wal-Mart Stores, Inc.*, No. CIV. 07-437-GPM, 2008 WL 905912, at *2 (S.D. Ill. Apr. 2, 2008) (remarking, in a related context, that "[f]or a landowner such as [Target], the cost of securing the entire store is simply too high to offset the small chance that parent-supervised children will find a way to injure themselves").

On balance, the Court concludes that these factors weigh in favor of not imposing a duty of care upon Target in this case. Thus, Plaintiffs cannot make out

their *prima facie* case under their theories of negligence or premises liability, and summary judgment for Target is granted.[7]

## II.     Claims Against Bravo

### A.       Negligent Design

As against Bravo, Plaintiffs seek to recover under theories of negligence and strict products liability.  In support of their negligence theory, Plaintiffs assert that the skateboard was defectively designed because Bravo should have equipped it with a better deterrent device.  Pls.' Resp. (Bravo) at 5.  Their theory appears to be that, because the truck box on Bravo's skateboards can be so easily removed, Bravo's skateboards can be too easily ridden in retail stores, making them unreasonably dangerous.

Under Illinois law, a plaintiff can bring a claim that a product is defectively designed through causes of action in both negligence and strict products liability. *Blue v. Envtl. Eng'g, Inc.*, 828 N.E.2d 1128, 1141 (Ill. 2005) (plurality opinion).  A negligence-based theory focuses on the defendant's conduct, whereas a strict products liability–based theory focuses on the product at issue.  *Id.*  To prove a product is defectively designed under a negligence theory, the same common law framework applies as outside the products liability context.  *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 270 (Ill. 2008).  Thus, a plaintiff must prove that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the

---

[7]     Because the Court grants summary judgment on this basis, it need not consider Target's additional arguments that Madison impliedly assumed the risk of the injuries she suffered, or that Target had no actual or constructive notice of the dangerous condition presented by the skateboard.

breach proximately caused the plaintiff's injury; and (4) the plaintiff suffered damages. *Id.* (citing *Ward*, 554 N.E.2d at 226). Moreover, "[t]he crucial question in a negligent-design case is whether the manufacturer exercised reasonable care in the design of the product." *Id.*

Bravo, like Target, argues that it is entitled to summary judgment on Plaintiffs' negligence claim because of the open and obvious rule. In defective design claims premised on negligence, the open and obvious rule applies in much the same fashion as described above. Just as with a premises liability–based claim, whether the danger presented by a purported design defect is open and obvious bears on whether the defendant owes a duty to the plaintiff. *Blue*, 828 N.E.2d at 1145–46. As before, this is a question of law for the Court to decide. *Id.*

Here, the danger presented by the skateboard's purported design defect— that the truck box could be removed and the skateboard used in a store—appears to be no different than the danger presented by the skateboard itself. Accordingly, for the same reasons as discussed above, the Court concludes that the skateboard's purported design defect presents an openly and obviously dangerous condition. On that basis, Madison's injury resulting from the purported defect was not reasonably foreseeable, because it was reasonable for Bravo to expect that she would not have ridden the skateboard in the Target store. Similarly, because the open and obvious nature of the danger made it likely Madison would avoid the injuries she suffered, her injuries were not likely to occur for the purposes of this analysis.

Moreover, the magnitude of the burden and consequences of imposing a burden on Bravo in this case would be significant. Bravo would not only have to conduct research to determine an appropriate deterrent device that is impenetrable within a retail store, but would have to outfit all of its skateboards with that device, no doubt at great expense. Granted, Bravo has other deterrent devices at its disposal, but Plaintiffs have not indicated that substituting one of these devices would remedy incidents like that involving Madison in a cost-effective manner. In addition to implementing a new deterrent device, Bravo would then need to monitor the effectiveness of its device in retail stores across the country to guard against its circumvention. This imposition is unjustifiable given the open and obvious danger of riding a skateboard in a retail store.

For these reasons, the Court finds that Bravo did not owe Madison a duty of care and therefore grants Bravo summary judgment on Plaintiffs' negligent-design claim.

## B. Strict Products Liability

Plaintiffs' strict products liability claim is premised on the notion that (1) Bravo failed to warn of the danger its use presented, and (2) the skateboard at issue had two design defects: an inadequate deterrent device and plastic wrapping. Pls.' Resp. (Bravo) at 9–10.

Little need be said about Plaintiffs' failure to warn theory. To succeed under a failure to warn theory, Plaintiffs would need to show that Bravo's skateboard "possesses dangerous propensities and there is unequal knowledge with respect to

the risk of harm," and that Bravo, "possessed of such knowledge, knows or should know that harm may occur absent a warning." *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002). The problem facing Plaintiffs in making this showing, however, is that "[n]o duty to warn exists where the danger is apparent or open and obvious." *Id.* And as explained above, the risks presented by Bravo's skateboard were open and obvious. Plaintiffs' failure to warn theory therefore fails.

Plaintiffs' design defect theory requires lengthier consideration. To prove a strict products liability claim based on a design defect, a plaintiff must demonstrate that the product's design renders it unreasonably dangerous. *Calles*, 864 N.E.2d at 254. To determine whether a product is unreasonably dangerous, Illinois courts apply both the consumer-expectation test and the risk-utility test. *Id.* at 255. The consumer-expectation test asks whether a product "failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Id.* at 256. To that end, the consumer-expectation test requires that a plaintiff "establish what an ordinary consumer purchasing the product would expect about the product and its safety." *Id.* at 254. The "ordinary consumer" is an objective persona that represents the typical user and purchaser of the product at issue. *Id.* at 256. Typically, application of the consumer-expectation test is a task for the jury, *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 353 (Ill. 2008), but it can be decided as a matter of law where no reasonable jury could find that a product performed other than how an ordinary consumer would expect, *Calles*, 864 N.E.2d

at 257; *see also Hadrys v. Biberach*, No. 1-09-0075, 2011 WL 9673575, at *6 (Ill. App. Ct. Dec. 23, 2011).

The risk-utility test requires that a plaintiff "demonstrate[] that the magnitude of the danger outweighs the utility of the product, as designed." *Calles*, 864 N.E.2d at 257. In weighing risk versus utility, Illinois courts look to a wide variety of factors, which include "the magnitude and probability of the foreseeable risks of harm; the instructions and warnings accompanying the product; the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing; the likely effects of any alternative designs on production costs; and conformity with industry standards, voluntary organization guidelines, and government regulation." *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 846 (7th Cir. 2013) (citing *Mikolajczyk*, 901 N.E.2d at 335). On summary judgment, "the court must balance factors it finds relevant to determine if the case is a proper one to submit to the jury." *Calles*, 864 N.E.2d at 261 (citing Restatement (Third) of Torts: Products Liability § 2, Reporters' Notes, cmt. e (1988)). Then, if the case is submitted to the jury, the jury must determine what factors are relevant and what weight to give them. *Id.*; *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 109 (Ill. App. Ct. 2010).

Where the consumer-expectation and risk-utility tests produce different results, the risk-utility test prevails. *Mikolajczyk*, 901 N.E.2d at 352; *see also Ferraro*, 721 F.3d at 846. In such cases, it is more helpful to consider the tests in an integrated manner, with consumer expectations serving as one factor to weigh in

the risk-utility calculus. *See Mikolajczyk*, 901 N.E.2d at 352–53. Moreover, while an open and obvious danger automatically obviates any duty to warn, not so where a design defect is concerned. *Calles*, 864 N.E.2d at 259–60. Rather, whether a design defect presents an open and obvious danger is just one additional factor to consider among the myriad others in the risk-utility calculus.[8] *Calles*, 864 N.E.2d at 260; *Blue*, 828 N.E.2d at 1145.

### 1. Truck Box

Plaintiffs' first asserted design defect is the skateboard's truck box. In support of their argument that this feature rendered the skateboard unreasonably dangerous, Plaintiffs point only to the reason they think the truck box renders the skateboard defective: it is too easily removed, permitting individuals in Madison's position to take it off and ride the skateboard. Plaintiffs offer no evidence as to the expectations of ordinary consumers, nor do they argue that the risk presented by the truck box outweighs its utility relative to other potential deterrent devices. Because Plaintiffs have offered no meaningful argument in line with either test for determining liability for a design defect, Bravo is entitled to summary judgment. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744–45 (7th Cir. 2007) (affirming award of summary judgment on design defect claim where plaintiff did not offer any evidence

---

[8] It is unclear how, under Illinois law, the open and obvious rule impacts application of the consumer-expectation test. Early decisions suggest that an openly and obviously dangerous defect can never constitute a design defect under the consumer expectation test. *Hunt v. Blasius*, 384 N.E.2d 368, 372 (Ill. 1978) (holding that "[i]njuries are not compensable in products liability if they derive merely from those inherent properties of a product which are obvious to all who come in contact with the product," and applying this rule in the context of the consumer-expectation test). This issue, however, is of limited importance given the determinative status of the risk-utility test.

of consumer expectations or comparative analysis of alternative designs); *see also Assaf v. Cottrell, Inc.*, No. 10 C 85, 2012 WL 4177274, at *3 (N.D. Ill. Sept. 19, 2012).

In any case, Plaintiffs could not establish a design defect regarding the skateboard and its truck box under either test, making their claim unfit to submit to a jury. Plaintiffs have offered no evidence from which a reasonable jury could find that the skateboard or the truck box did not function as an ordinary consumer would expect. Even if the truck box can be easily circumvented, an ordinary consumer would expect that riding a skateboard in a retail store would create a risk of falling down from its use. Thus, Plaintiffs cannot succeed under the consumer expectation test.

Under the risk-utility test, the open and obvious nature of the skateboard's purported defect again weighs in Bravo's favor. It also reduces the magnitude and possibility of harm, as explained above, pointing another factor in Bravo's favor. The parties acknowledge that the skateboard was equipped with a warning accessible to a reader in Madison's position that cautioned against use without proper protective wear. Finally, there is no evidence in the record from which the Court can evaluate the cost and utility of alternative designs for equipping Bravo's skateboards with deterrent devices, nor is there any indication that Bravo did not comply with industry standards, voluntary organization guidelines, or government regulations. On balance, therefore, the relevant factors under the risk-utility test

weigh entirely in Bravo's favor regarding the skateboard's truck box, and Plaintiff's claim is unfit to submit to a jury.

## 2. Plastic Wrap

Plaintiffs' argument that the skateboard's plastic wrap is a design defect fares no better. The plastic wrap is a design defect, Plaintiffs explain, because it covers the skateboard's grip tape, rendering the skateboard unsafe to ride with the wrap in place. Of course, this purported defect is in some tension with Plaintiff's initial position. Plaintiffs initially maintain that the skateboard is defective because the truck box fails to prevent it from being ridden in retail stores, while their second theory assumes such riding should occur and must therefore be made safer. This is an odd position for Plaintiffs to take.

Nevertheless, as Plaintiffs point out, "[a] strict product liability action may be based on an injury resulting from defective packaging." Pls.' Resp. (Bravo) at 9 (citing *Perez v. Fid. Container Corp.*, 682 N.E.2d 1150, 1153 (Ill. App. Ct. 1997)). But *Perez* does not deal with a case where a product user failed to remove obvious packaging material prior to using the product in a store without purchasing it, nor have Plaintiffs provided any authority holding as much.[9] Plaintiffs have not provided any further analysis or support for their theory concerning the plastic

---

[9] Plaintiffs seek to draw on *Miller v. Rinker Boat Co.*, 815 N.E.2d 1219 (Ill. App. Ct. 2004), by analogy. In *Miller*, the plaintiff alleged various design defects related to anti-skid paint applied (and in some areas, not applied) to the surface of a boat, including that the paint failed to prevent individuals from slipping on it when wet, which was an intended and reasonably foreseeable circumstance in using the boat. *Id.* at 1235–36. But unlike using a boat in water, riding a skateboard covered in plastic wrap in a retail store is not an intended or reasonably foreseeable use.

wrap under either the consumer-expectation or the risk-utility test, which again requires summary judgment in Bravo's favor. *Winters*, 498 F.3d at 744–45. Moreover, it is not reasonably foreseeable that an ordinary skateboard user would ride a skateboard without first removing the plastic wrap, and if a skateboard user did so, he or she would reasonably expect to fall, negating any finding of defect under the consumer-expectation test. Finally, the utility of protecting a skateboard's appearance for sale outweighs the need to eliminate the open and obvious risk presented by riding the skateboard with the plastic wrap on. Accordingly, Plaintiffs' design defect theory based on the skateboard's plastic wrap also fails.

For these reasons, the Court concludes that no reasonable jury could find that Bravo's skateboard suffered from a design defect and the Court therefore grants summary judgment to Bravo on Plaintiffs' strict products liability claim.

## Conclusion

For the foregoing reasons, Target's motion for summary judgment [61] and Bravo's motion for summary judgment [73] are granted. Civil case terminated.

**IT IS SO ORDERED.**          **ENTERED**    3/17/17

_____
**John Z. Lee**
**United States District Judge**